

**SIGNED this 31 day of May, 2011.**

_____
**JAMES P. SMITH
UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 7 |
| | : | |
| PERDETA BUSH, | : | |
| | : | |
| Debtor | : | Case No. 10-30476 JPS |
| | : | |
| PERDETA BUSH, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| EDUCATION, | : | |
| | : | Adversary Proceeding |
| Defendant | : | No. 10-3019 |

BEFORE

JAMES P. SMITH
UNITED STATES BANKRUPTCY JUDGE

\

APPEARANCES:

For Perdeta Bush, Plaintiff          Brenda J. Renick
                                     1060 Gaines School Rd., Ste A4B
                                     Athens, GA 30605


For United States Department         Bernard Snell
  Of Education, Defendant            Assistant United States Attorney
                                     P.O. Box 1702
                                     Mulberry Street, Suite 400
                                     Macon, GA 31202

## **MEMORANDUM OPINION**

Debtor Perdeta Bush filed her Chapter 7 petition on March 12, 2010. Debtor then filed this adversary proceeding contending that her student loan indebtedness to Defendant United States Department of Education is dischargeable in bankruptcy. This adversary proceeding came on for trial on February 24, 2011. After considering the evidence presented at trial, including the testimony of the witnesses and the exhibits, and the proposed Findings of Fact and Conclusions of Law submitted by each party, the Court hereby publishes this memorandum opinion in accordance with Bankruptcy Rule 7052.

## **FACTS**

Debtor graduated from Cedar Shoals High School in Athens, Georgia, in 1991. Following her high school graduation, Debtor enrolled in Georgia Southern University from 1991 to1997. Debtor financed her education with federal grants and student loans. Debtor graduated from Georgia Southern in 1997, having obtained a Bachelor of Science degree in Public Relations. Repayments on Debtor's student loans first became due 6 months later, in March 1998.

Following Debtor's graduation from Georgia Southern, she was employed by Mayfield Dairy in 1997, as a tour guide with an hourly wage of $7.25. In 1998, Debtor was employed by Mayfield Dairy as an assistant to the plant manager with an hourly wage of $11.00. In 1999, Debtor was employed by the Visitor's Center in Baldwin County, Georgia, as a coordinator with an annual salary of $32,000 to $33,000.

Debtor moved to California in 2000, where she was employed by another dairy company as inventory control coordinator for two years with an annual salary of approximately $34,000. Debtor was laid off in 2002 and was mostly unemployed for approximately one year.

In 2002, while residing in California, Debtor enrolled in the University of Phoenix (California) to pursue a Master of Arts degree in Organizational Management. Debtor attended the University of Phoenix for two semesters but did not obtain a degree. Debtor financed her education at the University of Phoenix by obtaining additional student loans.

In 2003, Debtor was employed by Americorps and earned approximately $990 per month. In addition, Americorps offered an educational benefit that could be applied to prior student loans or used for future education. Debtor elected to have the benefit, worth $1,725, applied to her student loans.

Debtor married Kevin Weatherspoon in November 2003. In 2004, Debtor and her husband returned to Georgia and Debtor was employed by Rock Eagle 4-H Center with an annual salary of $34,000 to $35,000. In February 2005, Debtor began employment in Athens, Georgia, as an intervention specialist through a grant-based research program at the University of Georgia where she remained employed until January 2010, with an annual salary of $34,000 to $35,000.

Mr. Weatherspoon was also indebted to the United States Department of Education for loans incurred to finance his college education. On June 28, 2005, Debtor and her husband consolidated their student loan indebtedness and evidenced the consolidation agreement by jointly executing a promissory note agreeing to be held jointly and severally

4

liable for the entire amount of debt totaling approximately $96,000, principal. Approximately 2/3 or $64,000 of this debt represented debt incurred by Debtor and approximately 1/3 or $32,000 represented debt incurred by Mr. Weatherspoon. Debtor and Mr. Weatherspoon were divorced in November 2006, and Debtor remains unmarried.

Currently, Debtor is pursuing a Master's degree in Adult Education with emphasis on adult literacy from the University of Georgia. Debtor currently works as a part-time research assistant and receives approximately $1,700 per month. Debtor has not received any new student loans while in the Master's program. Debtor plans to graduate at the end of the 2011 Summer semester. Thereafter, she plans to apply to the Ph.D. program at the University of Georgia and obtain her Ph.D. in Adult Literacy and Learning. She does not plan to seek any new student loans to accomplish this goal.

Debtor's current debt on her student loans exceeds $104,000 with an interest rate of 3.75 percent per annum. Since she graduated from Georgia Southern in 1997, Debtor has received numerous educational and economic hardship deferments. In June 2005, Debtor and her then husband executed a repayment plan with Defendant whereby they agreed to pay their student loans under the Income Contingent Repayment Plan.[1] However, the only actual payment Debtor has ever made on her student loans was for $100 on December 7, 2007. Debtor's attempts to make two other $100 payments around the same time were rejected by her bank for insufficient funds. Debtor did receive an educational benefit from Americorps

---

[1] Under the Income Contingent Repayment Plan, the borrower's annual repayment amounts are based on the adjusted gross income of the borrower, and, if married, his or her spouse, and allows for payment over a term of up to 25 years. Any amount not paid by the end of the 25th year is cancelled, and is taxable income in the year cancelled. 34 C.F.R.§ 685.209.

5

of $1,725 which was applied to her student loans in April 21, 2008.[2]

Debtor is 37 years old and plans to work another 25 years. Debtor has no physical or mental illnesses, impairments or disabilities. At all times relevant, Debtor has had no children or other dependents. Debtor's Schedules I and J reflect average monthly net income of $1,376.84 and expenses of $1,910, which results in a negative net monthly income of $533.16. Debtor's Schedules list total liabilities in the amount of $133,475, of which $98,970.00 is student loan debt, which represents 74% of her total liabilities.

### DISCUSSION AND CONCLUSIONS OF LAW

Section 523(a)(8) of the Bankruptcy Code provides that an educational (student) loan made, insured or guaranteed by a governmental unit is not dischargeable in bankruptcy unless exempting the debt would be an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8). Debtor has the burden of proving, by a preponderance of the evidence, that repayment of her student loans would be an undue hardship. Educ. Credit Mgmt. Corp. (In re Mosley), 494 F.3d 1320, 1324 (11th. Cir. 2007).

In Douglas v. Educ. Credit Mgmt. Corp (In re Douglas), 366 B.R. 241 (Bankr. M.D. Ga. 2007), Judge Laney explained the status of the law in the Eleventh Circuit as applicable to discharging student loan debt. As Judge Laney explained:

> Discharging student loan debt in bankruptcy is a difficult proposition

---

[2] As a result of the June 2005, consolidation of Debtor's and her former husband's loans, overpayments of $1,800.and $1,186.41 were applied to the consolidated loans in August 2005, and November 2005, respectively. These were merely adjustments to the account made in connection with the consolidation of the loans and did not come from the earnings of Debtor or her former husband.

and requires a finding of extreme circumstances by the court. Section 523(a)(8) of the Federal Bankruptcy Code ("Code") provides that an educational loan is not dischargeable in bankruptcy "unless excepting such debt from discharge . . . would impose an *undue hardship* on the debtor and the debtor's dependents." The term "undue hardship," is not defined in the Code. The term, therefore, has been considered by many courts across the nation with two primary standards emerging: the totality of the circumstances test and the *Brunner* test. The *Brunner* test, which was originally articulated by the Second Circuit Court of Appeals in 1987, provides that proving undue hardship requires a three-part showing: (1) the debtor cannot maintain, based on current income and expenses, a *minimal* standard of living for herself and her dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) the debtor has made good faith efforts to repay the loans. [*Brunner v. New York State Higher Educ. Serv's. Corp.* (*In re Brunner*), 831 F.2d 395, 396 (2nd Cir. 1987)].

In the 2003 case of *Hemar Insurance Corp. of America v. Cox (In re Cox)* [338 F.3d 1238 (11th Cir. 2003], the Eleventh Circuit Court of Appeals joined the majority of circuits around the nation and adopted the *Brunner* test as its standard for determining undue hardship under § 523(a)(8). In adopting the *Brunner* test, the Eleventh Circuit noted the Seventh Circuit Court of Appeals' observation in *In re Roberson* [999 F.2d 1132 (7th Cir. 1993)] that:

> The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.

The Eleventh Circuit, considering the 1998 amendments to the Code (which left proof of undue hardship as the only method for relief), recognized that Congress's intent "was to make it harder for the student to shift his debt responsibility onto the taxpayer. . . ." The *Brunner* test, said the Eleventh Circuit, is the most effective tool for identifying those debtors whose income and circumstances would make it most unlikely that they could repay their student loan obligations while still maintaining a minimal standard of living. Under

> the *Brunner* test, the debtor bears the burden of proving each of the
> three prongs by a preponderance of the evidence. Each of the three
> prongs or factors must be proven in order for this Court to find that an
> undue hardship exists, thus warranting discharge of the debt.

366 B.R. at 251-52. (internal citations omitted) (emphasis in the original).

A. *Brunner* Prong I - Minimal Standard of Living.

   In Douglas, Judge Laney explained:

> Under the first *Brunner* prong, Debtor must prove that she cannot
> maintain, based on current income and expenses, a *minimal* standard
> of living for herself . . . if forced to repay her student loans. In order
> for the Court to apply this prong, the Court must determine what is a
> "minimal standard of living." The Court agrees with the Bankruptcy
> Court for the Northern District of Alabama that a minimal standard of
> living is a "measure of comfort, supported by a level of income,
> sufficient to pay the costs of specific items recognized by both
> subjective and objective criteria as basic necessities." [*Ivory v. U.S.
> Dept. Of Educ.(In re Ivory)*, 269 B.R. 890, 899 (Bankr. N. D. Ala.
> 2001)]. As in most student loan repayment situations, some level of
> sacrifice is required in order to stay current on payments. A debtor is
> not required, however, to sacrifice in such a degree that the debtor
> and/or debtor's dependents are cast into an existence where some
> minimal standard of living cannot be obtained. In other words, a
> debtor is not required, under the undue hardships standard, to live in
> "abject poverty" in order to service a student loan debt. The *Brunner*
> test strikes a proper balance by "safeguard[ing] the financial integrity
> of . . . student loan program[s] by not permitting debtors who have
> obtained the substantial benefits of an education funded by taxpayer
> dollars to dismiss their obligation merely because repayment of the
> borrowed funds would require some major personal and financial
> sacrifices.

366 B.R. at 252-53. (internal citations omitted) (emphasis in the original).

   In this case, Defendant concedes that Debtor meets the first prong of the *Brunner* test.

As stated above, Debtor's average monthly expenses exceed her income by some $533.

8

Debtor's average monthly expenses include: rent - $400; utilities - $480; food - $235; clothing - $40; laundry and dry cleaning - $25; medical and dental expenses - $7; transportation - $230; charitable contributions - $205; ad valorm taxes - $11; and education expenses - $200.  Debtor's charitable contributions of $205 seem excessive in light of her financial situation.  Nevertheless, even if this item is eliminated, her remaining monthly expenses exceed her average monthly income.  Thus, the Court finds that Debtor has shown by a preponderance of the evidence that she would not be able to maintain a minimal standard of living if she is required to repay the loans.

B.  *Brunner* Prong II -  Additional Circumstances.

Under the second prong of the *Brunner* test, Debtor must show that:

> . . . there are additional circumstances that exist suggesting that the debtor's state of affairs is likely to persist for a significant portion of the repayment period of the student loan.  The state of affairs referred to in the second prong is the determination made in the first prong, *i.e.* that the debtor cannot maintain, based upon current income and expenses, a minimal standard of living for herself . . . if required to repay her student loan.
>
> Applying prong 2 "does not necessarily require future income predictions."  Instead, prong 2 focuses on "the present existence of circumstances - circumstances *in addition to* a present lack of ability to pay - that strongly suggest an inability to pay the loan over an extended period of time . . . ."  Simply stated, under prong 2, the debtor must prove by a preponderance of the evidence that her financial situation is not likely to improve.  The debtor is not required to prove that her financial situation will persist due only to a serious illness, psychological problem, disability, or other exceptional circumstance; other types of circumstances could apply as well.  In making its determination, a court should consider factors such as the debtor's age, . . . debtor's education, work and income history, physical and mental health, and other relevant circumstances.  Satisfaction of prong 2

9

> should be based upon a "certainty of hopelessness" into the future, "not simply a *present* inability to fulfill [a] financial commitment. A "'bleak forecast of the near future . . . [where] the debtor's straits are only temporary' is insufficient to demonstrate undue hardship under the second prong of *Brunner*. Meeting these standard set forth under prong 2 is not an easy task for a debtor.

366 B.R. at 255-56. (internal citations omitted) (emphasis in the original).

At trial, Debtor testified that she would only pursue employment in the fields in which she had received or was seeking college degrees even if she could earn more money in other fields. Defendant argues that, by choice, Debtor is creating a situation where her financial situation will not improve.

Numerous courts have held that a debtor cannot meet the second prong of the *Brunner* test where the debtor has voluntarily limited his or her employment opportunities and income due to personal choice and failed to pursue higher paying jobs. See e.g. Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200 (10th Cir. 2005); Oyler v. Educ. Credit Mgmt. Corp., (In re Oyler), 397 F.3d 382 (6th Cir. 2004); O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559 (7th Cir. 2003); Kehler v. Nelnet Loan Services (In re Kehler), 326 B.R. 142 (Bankr. N. D. Ind. 2005). However, the evidence at trial shows that Debtor is pursuing a Ph.D. in adult literacy, a field in which she could earn in excess of $46,000. This is more than she has ever earned in her employment history in other fields and there is no evidence to suggest that she could earn more in a different field. Thus, the evidence establishes that Debtor is seeking to improve her financial situation. Nevertheless, Debtor has failed to establish, by a preponderance of the evidence, any additional circumstances which would suggest that her current economic situation will persist.

Debtor has no mental or physical impairments which would prohibit her from pursuing full-time employment in the future. Debtor has no dependents. At 37 years old, Debtor has the opportunity to be employed full-time for at least 25 to 28 years before reaching retirement age.

Currently, while she pursues her Master's degree at the University of Georgia, she is working as a research assistant and has an annualized income of $20,447.52. Her annualized expenses are $22,920. Debtor already has a degree in public relations and has work experience in inventory control, marketing, and as a tour guide. Thus, without any additional educational degrees, her employment history establishes that she has the capability of earning up to $35,000 per year. If she maintained her current standard of living, this would leave her over $12,000 per year to apply to her student loans.

Further, Debtor is currently pursuing a Ph.D degree with which she could earn over $46,000 annually. At her current standard of living, this would generate net income of $23,505 annually which could be applied to her student loans.

Debtor argues, however, that by applying the Internal Revenue Services's Financial Standards (the "IRS Standards"),[3] she has shown that she will not be able to maintain a minimal standard of living in the future if required to pay her student loans. Using a base gross salary of $46,502, Debtor argues that her monthly income and living expenses would be as follows:

---

[3] The IRS Standards, as revised February 17, 2011, can be found at
*www.irs.gov/individuals/article/0,,id=96543,00.html*

|  |  |
|---|---|
| Monthly Gross | $3,875.00 |

|  |  |
|---|---|
| Income Taxes | $581 |
| Mandatory retirement | $116 |
| Health Insurance | $198 |
| Housing | $716 |
| Non-mortgage housing (utilities) | $369 |
| Health Care | $60 |
| Telecommunications | $60 |
| Food, clothing, household supplies | $526 |
| Auto transportation expenses | $239 |
| Auto ownership expenses | $496 |
| Charitable contributions (8% tithe) | $320 |

|  |  |
|---|---|
| Income | $3,875 |
| Expenses | ($3,691) |
| Balance | +$184 |

Debtor argues that the $184 left after applying the IRS Standards is insufficient to allow her to pay her student loans.

Numerous courts have considered the use of the IRS Standards in the context of determining "undue hardship" under section 523(a)(8). Most of the courts have used the IRS Standards to determine a debtor's "minimal standard of living" under the first prong of the *Brunner* test. However, as the court in Albee v. United States Dept. Of Education (In re Albee), 338 B.R. 407 (Bankr. W. D. Mo. 2006) stated:

> . . . [I]t is not clear to the Court that Congress intended that the courts be bound by those standards in accessing whether the payment of student loan debt would constitute an undue hardship. Congress had the opportunity to indicate that if that was its intent in making the amendments to the Bankruptcy Code embodied in the Act. For example, in amended § 707(b) Congress specifically mandated that the courts utilize the IRS National Standards, Local Standards and standards for Other Necessary Expenses to determine a debtor's appropriate expenses in assessing whether the debtor has sufficient disposable income that the filing of a Chapter 7 proceeding would constitute an abuse. 11 U.S.C. § 707(b)(2)(A)(ii). In addition, Congress mandated that those same

> standards be utilized in accessing the disposable income of Chapter 13 debtors whose income is above the applicable median. 11 U.S.C. § 1325(b)(3). The Act also included an amendment to paragraph (8) of § 523(a), the governing provision here, which expands the type of indebtedness subject to the requirement that discharge only be obtained upon a showing of undue hardship. 11 U.S.C. § 523(a)(8)(B). Therefore, while Congress specifically required the courts to utilize the IRS standards in certain places and did make amendments to § 523(a)(8), it did not purport to require the courts to be bound by those standards in making the undue hardship determinations. Accordingly, the Court does not consider itself bound by such standards in this context.

338 B.R. at 412. Accordingly, most courts have concluded that the IRS Standards are simply one piece of evidence to be considered under the *Brunner* analysis. See e.g Miller v. Sallie Mae, Inc. (In re Miller), 409 B.R. 299, 318 (Bankr. E. D. Penn. 2009).

Indeed, blindly applying the IRS Standards may lead to an erroneous calculation of the debtor's "minimal standard of living". As the court in Educ. Credit Mgmt. Corp. v. Howe (In re Howe), 319 B.R. 886 (9th Cir. B.A.P. 2005) explained:

> . . . [T]he living expense allowance under the IRS Standards increases not only with a debtor's family size, but also with his or her income. What is necessary for a minimal standard of living may differ depending on certain factors commonly associated with income. For example, a debtor employed in a professional occupation may require a higher clothing budget than a non-professional debtor. However, all other factors being equal, the amount necessary to maintain a minimal standard of living under § 523(a)(8) should not be adjusted upward just because one debtor has a higher income that another.
>
> Secondly, a bankruptcy court should not allow a debtor more than the debtor's actual expenses. Sometimes the amount that a debtor actually spends will be less than the amount permitted under the IRS Standards. Allowing a debtor more than he or she actually spends is inconsistent with the requirements of the economy and sacrifice necessary to obtain discharge of student loan debt under § 523(a)(8).
>
> Third, the IRS Standards do not provide for certain expenses that courts have recognized as necessary to the maintenance of the minimal standard of living

13

in § 523(a)(8) cases.

319 B.R. at 893.

Here, Debtor is seeking to use the IRS Standards to establish under the second *Brunner* prong that her inability to maintain a minimal standard of living will continue into the future if required to repay her loans . But, as noted by the Court in In re Howell, supra, by applying the IRS Standards for a higher income, Debtor is automatically increasing the amount she deems necessary to maintain a minimal standard of living. While some increased expenses may be appropriate, many are not.

For instance, Debtor is projecting housing and utility costs (excluding phone) at $1,085. This compares to Debtor's current housing and utility expenses of $757. Debtor testified at trial that she was living in a bad neighborhood. Accordingly, it would not be unreasonable for her to seek better housing as her income increases. However, there is no evidence to suggest that better housing would require a 43% increase in cost.

Debtor also projects $320 per month for charitable contributions. While contributing to charities is laudable, it should not be done at the taxpayers' expense. Accordingly, this Court does not believe that this expense is appropriate in contemplating Debtor's furture economic prospects.

Debtor has also projected automobile ownership expenses of $496 monthly. Debtor does not own a car at this time. Rather, she uses public transportation or borrows friends' cars. In her current budget, she provides for $230 per month in transportation expenses. In her projected expenses, this amount is increased to $239 per month, plus an additional ownership expense of $496 per month. Although car ownership is allowable, In re Douglas,

366 B.R. at 253, the Court questions whether ownership is necessary *here* to maintain a minimal standard of living in light of the fact that Debtor is currently able to attend school and maintain a part-time job without owning a car.

By deleting these questionable items from her expenses, Debtor's monthly expenses can be reduced to $2,311. This is still $485 more than her current monthly living expenses.[4] If she attains the projected income level of $3,875 per month, she will have net monthly income of $1,564, after taxes, that could be applied to her educational debts. Further, even if she does not complete her current educational goals, Debtor has shown the ability to earn up to $35,000 per year, or $2,916 per month. Applying the same expense analysis discussed above (including 15% of monthly income for taxes) would result in an expense level of $2,052, leaving Debtor with net monthly income, after taxes, of $748 that could be applied to her educational loans.

Additionally, Mark Scanlon of the United States Department of Education testified at trial about payment options available to Debtor. Mr. Scanlon has over 30 years experience in the area of student loans. He testified that while Debtor is a full-time student, she could get a deferment on payment of her loans. Upon graduation, there would be numerous repayments options available to Debtor which would allow her to make very low payments over time, and possibly obtain forgiveness of significant portions of her debt.

For instance, Mr. Scalon testified that Debtor is eligible for the Income Base Repayment Plan pursuant to which her monthly payments would be limited to no more than

---

[4] This $485 excess excludes Debtor's current $200 per month educational expense for books and fees which will disappear once Debtor leaves school.

15% of the amount by which Debtor's adjusted gross income exceeds 150% of the United States Department of Health & Human Services Poverty Guidelines (the "HHS Guidelines").[5] See 34 C.F.R. § 685.208(m). He further testified that if Debtor remained current for 25 years under this plan, the balance of her student loans at that time would be forgiven. See 34 C.F.R. § 685.221. According to his testimony, the cancellation of debt would be a taxable event. However, if Debtor chose a career in "public service", she would be able to receive a forgiveness of debt after only 10 years of payments, see 34 C.F.R. § 685.219, which, he testified, would not be a taxable event. Given Debtor's work history and her chosen path for future education, Mr. Scanlon testified that she would be qualified for "public service' types of jobs such as teaching, or working for a government entity, a 501(c)(3) entity, or a private company supplying public services such as national emergency or public education services.

Under the HHS Guidelines, the 150% poverty amount for a person with no dependents is $1,361.25 per month. Deducting this amount from her projected monthly income of $3,875[6], leaves a balance of $2,513.75 per month. Fifteen percent of this amount is $377.06. Based on the calculations discussed above, Debtor has the realistic prospects of having more than enough net income to make this minimum monthly payment.

In summary, the evidence establishes that, rather than facing a "certainly of hopelessness", Debtor's financial situation is likely to significantly improve. Accordingly, Debtor has failed to prove by a preponderance of the evidence any additional circumstances

---

[5] The HHS Poverty Guidelines can be found at *http://aspe.hhs.gov/poverty/11poverty.shtml*.

[6] Debtor gave no testimony as to any deductions which would be applied to reduce her "gross monthly income" to "adjusted gross monthly income".

which would cause her current economic condition to persist.

C. *Brunner* Prong 3 - Good Faith Efforts To Repay Loans.

As Judge Laney discussed in In re Douglas;

> With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses. Satisfaction of this third prong of the *Brunner* test requires a showing that the debtor made efforts to satisfy the debt by all means - or at least by *some* means - within the debtor's reasonable control. A lack of bad faith is not the applicable test for deciding the third pong of *Brunner*. Actual payments are not required to prove good faith. The debtor is tasked with proving that either a good faith effort was undertaken to repay the student loans or that the forces preventing repayment were truly beyond his or her reasonable control. Since a debtor's good faith is interpreted in light of his ability to pay, a complete failure to make even minimal payments on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payments.

366 B.R. at 259. (emphasis in the original).

The evidence establishes that, since graduating from Georgia Southern in 1997, Debtor earned approximately $34,000 per year between 2000 and 2002, $34,000 to $35,000 per year in 2004, and $32,000 to $35,000 per year from 2005 to the beginning of 2010. However, during this time Debtor made only one payment on her student loans of $100 in December 2007, and applied her Americorps education benefit of $1,725 in April 2008.

At trial, Debtor testified that she has received numerous economic hardship deferments as well as educational deferments. However, from the time she graduated from Georgia Southern in 1997 until she entered her current masters degree program sometime in

2010, is a period of 13 years. During that time, Debtor was in school, and thus eligible for an educational deferment, for only one year. Economic hardship deferments are limited to a total of 3 years. See 34 C.F.R. § 685.204 (c). Accordingly, for at least 8 years between 1997 and 2010, Debtor was earning more than $30,000 per year, was not subject to any educational or economic hardship deferments, but nevertheless made almost no payments on her student loans.

At trial, Debtor testified that she tried to make payments during this time but was unable to do so. She testified that when she could not make a full payment, she tried to make a partial payment. However, other than the two payments mentioned above, there is no evidence of any payments in any amount. Debtor provided no testimony as to what her expenses were during the times she was earning more than $30,00 per year and not subject to a deferment. If, during this time, Debtor had maintained a minimal standard of living, she should have had sufficient excess income to allow her to make some payments on her loans. However, she did not do so.

In conclusion, Debtor has failed to establish by a preponderance of the evidence that she made a good faith effort to repay her loans. Accordingly, Debtor has failed to satisfy the third prong of the *Brunner* test.

## **CONCLUSION**

For the reasons set forth above, the Court finds that Debtor has not established by a preponderance of the evidence that excepting her student loans from discharge would impose an undue hardship. Accordingly, Debtor's request for a discharge of her student loans is denied. A separate judgment consistent with this opinion shall be entered.

**END OF DOCUMENT**